# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT KNOXVILLE
### August 20, 2002 Session

## STATE OF TENNESSEE v. STEPHEN DENTON

**Direct Appeal from the Criminal Court for McMinn County**
**Nos. 98-535 to 98-539, 98-694 to 98-705, 99-244 to 99-248      R. Steven Bebb, Judge**

_____

**No. E2000-02615-CCA-R3-CD**
**October 28, 2003**
_____

In August 1998, the McMinn County Grand Jury indicted the Defendant, Stephen L. Denton, M.D., for one count of rape, two counts of sexual battery, and two counts of unlawful distribution of a Schedule IV controlled substance. In November 1998, the McMinn County Grand Jury indicted the Defendant for three counts of rape, one count of attempted rape, and eight counts of sexual battery. In March 1999, the McMinn County Grand Jury indicted the Defendant for one count of rape and four counts of sexual battery. In sum, the Defendant was charged in three different indictments for twenty-two criminal offenses involving eleven different female patients. Despite repeated objections by the Defendant, the three indictments were consolidated for trial. Four of the counts were nollied before trial, two more counts were dismissed at the conclusion of the State's proof, and the final sixteen counts were considered by the jury. The jury convicted the Defendant for six counts of sexual battery, one count of sexual battery by an authority figure, and three counts of assault and acquitted the Defendant on the remaining six counts. Following a sentencing hearing, the trial court imposed an effective sentence of five years of incarceration. On appeal, the Defendant contends: (1) that the trial court erred by denying his Motion for Severance; (2) that the trial court erred by denying his Motion to Suppress his statement given to law enforcement officers after his arrest; (3) that the trial court erred by allowing the State to improperly cross-examine the Defendant and his former wife; (4) that the Defendant did not exercise "supervisory power" over his patient, and, therefore, was improperly convicted for sexual battery by an authority figure; (5) that the State presented improper closing arguments that were "so inflammatory and prejudicial as to require reversal;" (6) that the Defendant's conviction for assault against an undercover law enforcement officer should be dismissed because the undercover officer consented to the actions of the Defendant; (7) that the State failed to elect the incident upon which it was relying to support one of the Defendant's sexual battery convictions; and (8) that the trial court improperly sentenced the Defendant. Finding reversible error in case number 98-538, we reverse and remand the Defendant's conviction for assault in that case. We affirm all of the other judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed in Part, Reversed in Part, and Remanded.**

ROBERT W. WEDEMEYER, J., delivered the opinion of the court, in which GARY R. WADE, P.J., joined. JAMES CURWOOD WITT, JR., J., not participating.

D. Mitchell Bryant, Cleveland, Tennessee, and Victoria B. Eiger, New York, New York (on appeal); and Robert W. Ritchie and David M. Eldridge, Knoxville, Tennessee (at trial), for the appellant, Stephen L. Denton, M.D.

Paul G. Summers, Attorney General and Reporter; Michael Moore, Solicitor General; Mark A. Fulks, Assistant Attorney General; Jerry N. Estes, District Attorney General; and William W. Reedy and Amy F. Reedy, Assistant District Attorneys General, for the appellee, State of Tennessee.

## OPINION

## I. Background

### A. Pre-Trial Hearing on Defendant's Motion for Severance and Motion to Suppress his Statement

Prior to trial, the Defendant moved the trial court to sever the offenses against each of the nine victims contained in the November 1998 and March 1999 indictments. The Defendant agreed that the charges contained in the August 1998 indictment against him should be consolidated for trial. Thus, the Defendant requested ten separate jury trials as a means of disposing of the three indictments against him. The State argued that all of the charges should be consolidated and heard by one jury at one trial, asserting that the offenses were part of a common scheme or plan and that the evidence of one would be admissible upon the trial of the others. Tenn. R. Crim. P. 14(b)(1). Prior to deciding this issue, the trial court reviewed video tapes of law enforcement interviews with each of the eleven alleged victims. The trial court agreed that the cases should be consolidated for trial.

Prior to trial, the Defendant also filed a motion to suppress his statements given to law enforcement officers, which he allegedly made on the date of his arrest. The trial court conducted a hearing on the motion, at which the following evidence was presented: Detective Bill Matthews testified that he had been a detective with the Athens, Tennessee, Police Department for sixteen and a half years. In the summer of 1998, he became involved as an investigating officer in the case against the Defendant. Detective Matthews testified that eight to ten officers, including officers from the Athens Police Department, the McMinn County Sheriff's Office, and the Tennessee Bureau of Investigation ("TBI"), all participated in the arrest of the Defendant. Detective Matthews testified that on August 18, 1998, the same day that the McMinn County Grand Jury indicted the Defendant and issued a capias, he, with other law enforcement officers, proceeded to the Defendant's office. Detective Matthews testified that the officers searched Defendant's office for about an hour and a half to two hours, and that then Detective Matthews and Tennessee Bureau of Investigations Agent Todd J. Jordan took the Defendant to the McMinn County Justice Center. Detective Matthews

testified that he and Agent Jordan questioned the Defendant. He stated that the interview was conducted "mostly . . . [by] Agent Jordan and m[e]."

The Defendant was present in his office when the officers arrived, and he was placed in custody at that time. Detective Matthews testified that Miranda rights were read to the Defendant twice, first at the Defendant's office and again at the McMinn County Justice Center. Detective Matthews testified that the Defendant signed a written Miranda waiver. The detective stated that the Defendant was in an interview room for about forty-five minutes to an hour during which the Defendant gave a three-page statement. Detective Matthews testified that the Defendant's attorney, Holt Smith, arrived at the interview room, walked in and said, "Stephen what's going on?" Matthews reported that the Defendant said, "I just want to get this over with." Attorney Smith responded, "Stephen I don't know that you should be saying anything." According to Matthews, the Defendant's response was, "I just want to get this over with." Detective Matthews testified that at some point thereafter Attorney Smith advised the Defendant, "Stephen that's enough, stop," and that the interview was terminated. Detective Matthews recalled that when the Defendant was arrested in his office, he asked the detective, "[S]houldn't I have a lawyer," to which Detective Matthews recalled responding, "Well, that's up to you." Detective Matthews recalled Agent Jordan telling the Defendant that cooperation would be beneficial to the Defendant.

Detective Matthews testified that he and the Defendant looked upon each other "in a friendly fashion" during the time that the Defendant was being held at the justice center. The detective recalled that from time to time the Defendant would say things like, "Bill, what should I do," and Detective Matthews told the Defendant to "tell the truth." Detective Matthews also testified that he told the Defendant to cooperate and that he did not see how telling the truth could hurt the Defendant. Detective Matthews testified that the Defendant wanted to call his wife to discuss whether she should consent to a search of the Defendant's house. Detective Matthews reported that Agent Jordan told the Defendant he could not make a phone call at that time, but that he could later. Detective Matthews testified that the Defendant was never allowed to use the phone in the detective's presence.

Detective Matthews testified that the Defendant spoke with him alone and said words to the effect of "shouldn't I have a lawyer. I think I need a lawyer." In response, the detective told the Defendant "that's up to you," and "I feel like you are doing the right thing by telling the truth." Detective Matthews testified that when Agent Jordan came back into the interview room, the Defendant started answering Agent Jordan's questions. The detective recalled Attorney Smith coming to the door and Agent Jordan asking the attorney to step outside. Detective Matthews testified that after a few minutes both men came into the interview room and Agent Jordan said to Attorney Smith, "You can come in so long as you don't say anything." The detective testified that Agent Jordan asked the Defendant how to spell "genitalia," and at that point Attorney Smith said, "Stephen, I don't think you ought to say anything else." Detective Matthews recalled that the interview terminated at that point.

Detective Matthews testified that no one threatened the Defendant or promised him anything in exchange for making a statement. Detective Matthews also testified that the Defendant did not appear to be disoriented "past the point of understanding" and did not ask Detective Matthews any questions about any of the writings that had been read to him on the waivers. The detective testified that the Defendant did not indicate that he did not understand what was going on at any point in time.

Agent Jordan testified that he had been a special agent with the TBI for six and a half years, and that he served the capias on the Defendant in the Defendant's medical office. Further, he testified that he read a Miranda warning form to the Defendant in the Defendant's office, and the Defendant signed the form. Thereafter, Agent Jordan testified that he read and explained a consent-to-search form to the Defendant, which the Defendant signed. The agent testified that the Defendant asked if he could contact his wife to tell her that the police would be coming, and Agent Jordan told him that was not acceptable at that time. Agent Jordan characterized the Defendant as "cooperative" and said that he "seemed to be fully cognizant of what I was explaining to him." The agent testified that during the interview at the McMinn County Justice Center, either the Defendant or Detective Matthews asked him to leave the room, and he was gone five to ten minutes. Agent Jordan reported that when he returned to the room, Detective Matthews informed him that the Defendant wanted to tell the truth and "get this off his shoulders." The agent then began asking the Defendant about inappropriate contact with female patients.

Agent Jordan testified that while he was taking the Defendant's statement, the door to the interview room opened and Attorney Smith entered the room. Agent Jordan reported that Attorney Smith said he was the Defendant's friend and an attorney and that he was there for the Defendant. The agent testified that he "had the attorney t[aken] back out of the room, [and] asked the Defendant if he wanted . . . to speak to an attorney." In response, the Defendant said, "No, I just want to get this over with." The agent testified that he then went outside, spoke to the attorney, and explained to the attorney that the Defendant was giving a statement and did not want the attorney present. The attorney asked if he could, nevertheless, sit in while the statement was taken, and Agent Jordan replied, "Well, yes, if you will keep your mouth shut." The agent testified that he was to the point of writing the word "genitalia" and that he asked the Defendant to spell that word, which the Defendant did. Agent Jordan testified that before he could continue any further, the door came open and the attorney's wife, Mrs. Smith, entered the room. Agent Jordan testified that Mrs. Smith asked, "Is [the Defendant] ready to go? His bondsman is here." The agent testified that the Defendant turned to his attorney and said, "What do I do?" and the attorney said, "Don't say another word." Agent Jordan testified that it was at this point that the interview ceased.

Agent Jordan testified that the interview with the Defendant was not tape recorded and that he did not take any notes simultaneously with the interview, but after one or two hours he wrote down the oral statements that the Defendant made during the interview. The agent also testified that at some point while he was at the Defendant's office, he received a phone call from the Defendant's wife, who "wanted to know what it was all about." Agent Jordan testified that his response was, "I can't tell you at this time." The agent testified that he did not allow the Defendant's wife to speak with the Defendant and he did not allow the Defendant to make a phone call.

On cross-examination, Agent Jordan testified that the arrest of the Defendant was made at the Defendant's office, at which time Officer Jordan read the capias to the Defendant in response to the Defendant's question, "What's this all about?" Agent Jordan did recall the Defendant's requesting to call his wife at some point "early on in the process." Agent Jordan did not recall that the Defendant inquired about the Defendant's need for an attorney while he was in custody at the Defendant's office, but he did recollect the Defendant's stating, "Shouldn't I have an attorney?" during the interview process. Agent Jordan testified that he told the Defendant that if the Defendant cooperated, the District Attorney's Office would look more favorably upon his situation.

Levi Phillips testified that he was an officer with the Athens City Police Department and that he was involved in the investigation and arrest of the Defendant. Officer Phillips testified that on August 18, 1998, he was assigned to watch the Defendant and stay with him, which he did for two to four hours. Officer Phillips testified that at some point in time, while he and the Defendant were at the Defendant's office, the Defendant said to Phillips, "I f---ed up." Officer Phillips testified that his response was, "Well, it can't be that bad."

Attorney Holt Smith testified that on August 18, 1998, he was the Defendant's attorney in "at least two civil matters." Attorney Smith testified that he received a phone call from the Defendant's wife, who asked him to go to Athens to check into the arrest of the Defendant. Attorney Smith testified that when he went to the room where the Defendant was being held, Agent Jordan came out in the hallway and asked him what he was doing there. The attorney testified that he explained to Agent Jordan that he had received a call from the Defendant's wife regarding the Defendant's arrest and that he was there on the Defendant's behalf. Attorney Smith testified that Agent Jordan asked him if he was representing the Defendant in this case, to which the attorney responded, "Well, you know, his wife has called me." The attorney testified that Agent Jordan said that the Defendant told the officers that he did not need or want an attorney.

Attorney Smith testified that he told Agent Jordan he would like to talk to the Defendant and Agent Jordan said, "Well, I'm going to go back in and talk to him and see if he wants you to come in," or words to that effect. The attorney testified that three minutes later, Agent Jordan came out of the interview room and told him that he could come in, but that the Defendant did not want an attorney. Further, the agent told the attorney that if the agent allowed the attorney into the room he did not want the attorney to participate in any "grand standing." Attorney Smith testified that after he went inside the room, Agent Jordan was writing something and then asked the Defendant how to spell a word, at which time the Defendant looked to the attorney and said, "Should I say anything?" The attorney recalled that he said, "Steve, I just wouldn't say anything else." Shortly thereafter, the attorney's wife knocked on the door and informed those in the room that "the bondsman [was] [t]here." The attorney testified that Agent Jordan "sort of got irritated and said 'We can't turn this into a three ring circus.'" The attorney testified that "the thing just sort of shut down at that point."

The Defendant testified that he resides in Etowah, Tennessee, and that he had practiced medicine in McMinn County since 1981. He recalled that at 2:30 p.m. on the day of his arrest, he

had thirteen patients signed in, with four patients in the examining room and nine more in the lobby. The Defendant testified that law enforcement agents came into his office, grabbed him, and took him from exam room number one into the lab area. The Defendant testified that Agent Jordan told him "you know you have a right to a lawyer and you know the rest" and then immediately handcuffed him. The Defendant testified that as soon as the law enforcement officers put him in handcuffs, he asked to call a lawyer and his wife. The Defendant testified that the officers ignored his requests. The Defendant further testified that the law enforcement officers told him that if he agreed to the charges, that it would be more favorable for the jury and the judge. The Defendant testified that he signed the forms because "they told me if I didn't cooperate that things would really be bad for me, and I was sort of in a state of shock, I just, you know, just put [an initial] beside the thing." The Defendant testified that when he asked the officers a third time about a phone call, which was about an hour before "we were ready to leave," that Agent Jordan looked at him and said that he could make the call "when you get to the jail."

The Defendant testified that when he, Agent Jordan and Detective Matthews arrived at the jail, he asked again if he could call a lawyer and his wife. The Defendant testified that he asked Detective Matthews to have Agent Jordan step out of the room because the Defendant had known Detective Matthews since 1981 and thought that he could speak with him as a friend. The Defendant testified that after Agent Jordan left, he asked Detective Matthews what he should do and Detective Matthews said, "Well, doc, you had better do exactly what [Agent Jordan] said to do or you are going to be looking at 24 to 25 years in jail." The Defendant testified that he asked Detective Matthews if he thought he needed a lawyer and Detective Matthews responded "that calling a lawyer would be an admission of guilt and that would be looked upon unfavorably by the judge and the jury."

The Defendant testified that he did not understand anything he signed either at his office or at the jail because he was in a state of shock. The Defendant also testified that he did not read what he signed and that the officers were not being truthful when they said they read it to him. The Defendant stated that he did not make the statements attributed to him by the officers, but that the officers just wrote down what they wanted. The Defendant testified on cross-examination that he had not used any alcohol or any drugs on the day of his arrest.

Patricia Denton testified that she is married to the Defendant and that she and the Defendant live in Etowah, Tennessee. She testified that on August 18, 1998, she was at home when three men from the McMinn County Sheriff's Department came to her home. The men indicated that they wanted to search her house for drugs. Mrs. Denton testified that although she denied the officers permission to search the house, they proceeded to search anyway. She asked two of the officers where her husband was, and they told her he was at the office and that she could call the office, which she did. Mrs. Denton testified that she spoke with Agent Jordan who denied her request to speak to the Defendant. Mrs. Denton then called her best friend, Barbara Jo Smith, whose husband is an attorney. Mrs. Smith said she would call her husband and he would call Mrs. Denton right back. Attorney Smith called Mrs. Denton and, based upon his advice, she told the men at her home

that her lawyer was on the way. Mrs. Denton testified that their reaction was to speed up the process of "taking everything out of the bedroom upstairs."

## B. Evidence Presented at Trial

At trial, the State offered evidence from multiple women, each of whom alleged that the Defendant sexually assaulted them. Sandra Harley testified that in November 1992, when she was approximately eighteen years old, she experienced "some sort of female" problems and visited the office of the Defendant. Harley testified that she was told to undress from the waist down by the Defendant, who left the room while she undressed. She testified that she got on the examining table with her feet in the stirrups and that she had a white sheet over the lower portion of her body. She testified that the Defendant pushed on her abdomen, inserted one finger and then another finger into her vagina and then took his fingers out. She reported that the Defendant began to massage her clitoris and asked her if that hurt. She then got off the table, put her clothes on, grabbed her purse in one hand and her shoes in the other, and rapidly left the Defendant's office crying. Harley went to her father's house, and told him what had happened, whereupon her father called the police and the police came to the father's house. Harley testified that she reported the incident to a female police officer, and then she went to the hospital emergency room for a rape examination. She testified that she never went back to the police and never heard anything else about the case. In 1998, after learning that the Defendant had been arrested, she gave a videotaped statement concerning the 1992 incident to Detective Matthews and Agent Jordan.

James Landers testified that he is Sandra Harley's father and that he went to see the Defendant within five minutes of being told of the incident described by his daughter. Landers testified that when he asked the Defendant what he had done to his daughter, the Defendant told him all he did was "mash on her stomach" and write her a prescription.

Melissa Martin testified that in November 1997, she sought treatment from the Defendant for back injuries that she received in a car wreck. Martin reported that the Defendant told her that she was pretty, that her hair was pretty, and that she had the prettiest smile. Martin testified that when the Defendant listened to her chest and "mashed around" on her back, he would lay his head on one of her shoulders, which she thought was unusual. On her second visit to the Defendant's office, the Defendant sat in a chair and would roll up in the chair and would "have, like, an erection on him." Martin testified that she could feel the Defendant's erection on her leg.

Martin testified that at an appointment with the Defendant in May of 1998, the Defendant instructed her to stand up and unbutton her pants a little bit. The Defendant then rolled on a stool to the door, locked the door, rolled back to her, and stood behind her with an erection. Martin testified that the Defendant "went up under my shirt and he was massaging me and rubbing me and asked me if that felt good and if I had somebody to do that for me." Martin reported that the Defendant massaged her lower back and stuck his finger in her bottom and she told him "it's not hurting there." Martin testified that she went straight home and told her mother, Doris Ann Delzell, about this incident. The next day Martin talked to her attorney, Randy Rogers, about the incident. Martin

testified that she did not do anything about the incident because she was scared that everybody would believe the Defendant instead of her. Martin was never interviewed about this incident until after the Defendant's arrest and, at that time, she gave a videotaped statement to Detective Matthews.

Doris Ann Delzell, Melissa Martin's mother, testified that when Martin came to her upset about the conduct of the Defendant, Delzell wanted to confront the Defendant. She testified that her daughter did not want her to confront the Defendant, so she agreed that she would not if her daughter agreed to consult attorney Randy Rogers about the incident.

Randy Rogers, an attorney practicing in Athens, Tennessee, testified that Melissa Martin came to him for representation shortly after she was involved in an automobile accident on July 29, 1997. Rogers testified that Martin became distraught when he urged her to continue seeing the Defendant for her injuries. Rogers testified that Martin was reluctant to return to see the Defendant and that she began crying. Rogers testified that on the day that Martin became distraught and shared with him the problems about going back to the Defendant, he suggested "some remedies" including a potential civil action and the possibility of Martin's notifying police authorities as to what had been happening so that an investigation could be conducted. Rogers specifically recalled suggesting to Martin that she contact Detective Matthews.

Carolyn Grant testified that she lived in McMinn County in 1996 and 1997, and that Tenn Care assigned the Defendant as her doctor. Grant testified that she felt uncomfortable when the Defendant would listen to her heart because she did not feel it necessary for the Defendant to hold her breasts and squeeze her breasts to listen to her heart. Grant also testified that the Defendant asked her questions about her sexual relationship with her boyfriend and whether she had multiple sex partners. Grant testified that the Defendant's questions were "strange." Grant reported that the Defendant would sit on his stool and rub his genitalia against her knees at every visit. Grant also testified that the Defendant gave her his pager number and told her that if she needed to talk to anybody, they could get together and have drinks.

Sharon K. Roberts testified that she was referred to the Defendant through Tenn Care. Roberts testified that she went to the Defendant for back pain and that he put his hand down inside her "britches" in the back while he was listening to her heart. Roberts testified that she told the Defendant to move his hand because that was not where her back hurt. Roberts reported that each time the Defendant checked her heart, he would put one hand on her breast. Roberts testified that she was uncomfortable with this procedure. Roberts also testified that the Defendant told her she looked pretty and smelled good. Finally, Roberts testified that if she took her little girl into the examining room with her that the Defendant would not do anything inappropriate.

Brenda Mullinax testified that she went to see the Defendant on January 29, 1997, to get her cholesterol checked. She testified that the Defendant tried to put his privates on her legs and tried to rub her legs and arms. Mullinax testified that when the Defendant checked her heart, he listened to one side of her chest while placing his other hand on her breast, pushing her breast up. Mullinax reported that the Defendant asked her about previous anxiety attacks. She stated that he prescribed

diazepam for her even though she did not need it. Mullinax testified that she asked the Defendant's nurse to whom she could report the Defendant's behavior. Mullinax testified that a couple of days later she discussed the Defendant's behavior with Patricia Mull, who worked in the Defendant's office. Mullinax testified that she did not report the Defendant to authorities because she was afraid she would not be believed. Mullinax testified that after the Defendant's arrest, she gave a statement to the investigating officers.

Kathy Ritner testified that she was previously the victim of a sexual attack while serving in the Navy in California. She testified that upon her return to Tennessee, she received psychiatric therapy for the sexual assault. Ritner reported that she had about four appointments with the Defendant. She testified that she was on anti-depressants and nerve medicine. Ritner testified that the Defendant put his hand on her breasts when he was examining her heart and his private part was on her leg and she could tell he was sexually aroused. Ritner reported that when she told the Defendant she was going to obtain the services of another doctor, the Defendant became upset with her. Ritner testified that she was scared to be locked in an examining room with the Defendant. Ritner reported that the Defendant prescribed Valium and other drugs for her. She also testified that during the Defendant's examinations of her, he put his hands on her chest, in her rectum, and near her vagina. Ritner reported that, in her opinion, at no time was there ever a need for that type of touching. On cross-examination, Ritner agreed that she suffered from post-traumatic stress syndrome as a result of the previous sexual assault and that she was discharged from the Navy on medical retirement.

Jamie Hunt testified that she sought treatment from the Defendant in August 1997 because she was having chest pains from a car accident. Hunt testified that the Defendant listened to her chest and told her that he could not hear so he asked her to take off her shirt and then her bra. Hunt testified that the Defendant was rubbing and lifting her breasts. Hunt reported that although the Defendant gave her an EKG, he continued rubbing her breasts and her thighs. She also testified that the Defendant inserted a finger into her vagina. Hunt testified that she told her mother-in-law and her father-in-law about the incident, and that she also told her attorney, Robert Thompson. Hunt further testified that she contacted the medical board about the incident but didn't pursue it further until she found out about the other cases. Finally, Hunt testified that she had received $3,000 from the victim's compensation fund.

Amanda Pritchitt testified that she was seventeen years old on July 21, 1998, when she went to the Defendant's office to seek treatment for ringworm. She testified that the Defendant put the stethoscope on one breast and his hand on the other. Pritchitt reported that the Defendant told her how pretty she was and that she could be a "Playboy model." She testified that the Defendant was pressing up against her leg with his penis. Pritchitt testified that she was scared and about to cry. She reported that the Defendant asked her to pull her pants down so he could see her ringworm, and that she responded that she did not need to pull the pants down so that he could see the ringworm because it was right under her belly button. Pritchitt testified that the Defendant put his fingers between her "vagina lips" and was "rubbing her really rough there." Pritchitt testified that she told the Defendant there was no ringworm down there, and that the Defendant responded by telling her

in a disgusted voice to pull her pants up. Pritchitt testified that the Defendant wrote her a prescription for ringworm medication, and she walked out. Pritchitt stated that she went straight to her mother's place of employment and told her what had happened.

Pritchitt testified that she talked to Detective Matthews about three days after the incident, and he asked her to return to the Defendant's office with a camcorder in her purse. Pritchitt testified that a TBI agent named Patrice would accompany her to the Defendant's office. Matthews informed Pritchitt to tell the Defendant that Patrice had just broken up with her boyfriend and was having difficulty sleeping and eating. Pritchitt testified that later she was supposed to tell the Defendant that Patrice was a party girl and to ask the Defendant for a prescription for Patrice on Pritchitt's insurance. Pritchitt testified that she attended about four meetings with law enforcement about this plan. Pritchitt testified that the false name to be used by the TBI agent was Teresa Price. Pritchitt reported that she went back to the Defendant's office and videotaped that visit. The videotape was viewed by the jury.

Patrice Schermerhorn testified that she is a Special Agent with the TBI. Agent Schermerhorn testified that she posed as a patient of the Defendant's and a friend of Pritchitt's. The agent testified that she accompanied Pritchitt on a visit to the Defendant's office and stayed in the waiting room. The agent testified that posing as Teresa Price, she made an appointment with the Defendant's office and prior to the appointment, she was supplied with a camcorder for her purse and an audio transmitter. The Defendant's examination of Agent Schermerhorn was videotaped with the camcorder and viewed by the jury. Agent Schermerhorn testified that she stated to the Defendant, "I hear you might want to go out with Mandy and I one time." The agent reported that the Defendant responded that he did. The videotape indicated that the Defendant tried to hug and kiss the agent and that she pushed him away. The video indicated that the Defendant began moving back and forth against the agent's leg. The agent reported that the Defendant said, "Well, do you think we could go to a hotel room?" Agent Schermerhorn stated that she replied, "Yeah, we could probably work something out." Agent Schermerhorn testified that the Defendant then said, "Well, you know that we've got to go a little bit away from Athens." The agent reported that the Defendant said, "Do you think that you and me and Mandy could spend six or seven hours in a hotel room?" Agent Schermerhorn testified that she told the Defendant that probably something could be worked out.

Agent Schermerhorn testified that the Defendant tried to kiss her and that she pushed him off. The Defendant hugged her and kissed her on the side of the neck and "pretty much through the duration of the visit" pressed his groin up against her right knee shin area and started moving back and forth. She testified that the Defendant became erect and continued to "do this pretty much throughout" the visit. The agent testified that the Defendant asked her if she liked sex toys and she responded, "Well, I don't really know." She testified that the Defendant said he liked sex, "kinky sex, the kinkier the better."

The agent testified that she gave the Defendant her pager number in response to his question about how he could get in touch with her. Agent Schermerhorn reported that on two occasions, the Defendant stated that he had his favorite sex toy with him, at which point he "opened up his mouth,

stuck out his tongue and began to flick it at me. He did this twice." The agent testified that although she told the Defendant the purpose of her visit was for "sinus," that the Defendant wrote a second Valium prescription for her.

Detective Bill Matthews testified again at trial and offered similar testimony to that he gave at the pre-trial hearing. In addition to that testimony, Detective Matthews testified that Amanda Pritchitt and her husband came to him in July 1998 regarding allegations against the Defendant. Detective Matthews testified that he contacted the TBI because the TBI would have the equipment necessary to investigate the allegations. Detective Matthews testified about his participation in the Defendant's arrest. He testified that Agent Jordan read the Defendant Miranda warnings. Detective Matthews reported that the Defendant stated that he had probably touched female patients before, that he had "hunched on female patients' legs before," but that he did not have a problem–he would just get carried away at times. According to Detective Matthews, the Defendant admitted that he had consensual sex with patients in his office, had exposed his penis to patients and had erections with patients while touching their breasts and genitalia. Detective Matthews testified that the Defendant said that he never did anything with male patients and that he never over-prescribed medicines. According to Detective Matthews, the Defendant said that he and his wife had problems in the past and it was those problems that made the Defendant get carried away at times with some of his female patients.

Detective Matthews testified that Attorney Smith came into the interview room and asked the Defendant what was "going on." The detective testified that the Defendant said he "just wanted to get it over with" and that, thereafter, Agent Jordan talked to Attorney Smith outside of the interview room. Detective Matthews testified that Attorney Smith and Agent Jordan came back into the interview room and sat down. Detective Matthews testified that a short time later Agent Jordan asked the Defendant how to spell genitalia, and Attorney Smith told the Defendant not to say anything more. According to Detective Matthews, the interview with the Defendant lasted thirty-four minutes, with a number of interruptions.

Agent Jordan testified and offered testimony that was similar to his testimony at the pre-trial hearing. In addition to that testimony, Agent Jordan testified that he and Detective Matthews initiated an interview with the Defendant and that, prior to the interview, he had told the Defendant to be quiet and that "we would talk to him later." The agent testified that he participated in administering the Miranda rights waiver to the Defendant and that he went over "every one of them" and had the Defendant initial each one of them. Agent Jordan testified that the Defendant signed the Miranda rights waiver and indicated that Detective Matthews signed as a witness. Agent Jordan testified that at no time did the Defendant indicate any sort of confusion about what was being said to him or that he did not understand any of his rights. Agent Jordan testified that the Defendant was "very passive" and seemed to be looking at Detective Matthews.

According to the agent, at some point during the interview Detective Matthews told the agent that the Defendant would like for the agent to step out so that he could speak to Detective Matthews alone. Agent Jordan testified that he agreed and exited the room. According to Agent Jordan, he

later walked back into the interview room, and sat back down next to the Defendant. Detective Matthews then told him that the Defendant wanted to talk to him and to tell him the truth. Agent Jordan testified that he asked the Defendant general questions about the matters contained in the indictment and the Defendant acknowledged some of the allegations in the indictment and denied others. The agent testified that he did not make notes initially, but later on that evening he started "writing out and documenting the answers to that outline of questions that I had asked him."

Agent Jordan testified that the Defendant admitted inappropriate contact with female patients and consensual sex with patients. The agent reported that the Defendant vehemently denied sexual contact with male patients. According to Agent Jordan, the Defendant admitted that he had had some sexual contact with female patients that was "non-consensual or unwanted or unsolicited or something along those lines," but denied "having a problem." The agent testified that the Defendant stated that the acts started about three years ago as a result of some problems that the Defendant was having with his wife. Agent Jordan testified that the Defendant admitted to having "hunched" female patients in his office and admitted to touching breasts and genitalia of female patients.

Agent Jordan testified that he began the process of taking a sworn statement from the Defendant. The statement read as follows:

> About three years ago my wife and I began having problems. After that I began having intimate contact with female patients. Although some of the contact was mutual, some of the advances were unwanted, unsolicited, and not consensual. The contact I have had with patients consist of touching breasts and genitalia.

He reported that the sworn statement was interrupted by the appearance of Attorney Smith. Agent Jordan testified that he explained to Attorney Smith that he would need to step back outside. The agent and Detective Matthews asked the Defendant, "Do you want him in here, you know, what do you want to do?" The agent recalled that the Defendant said, "I don't want him in here, I just want to get this over with." The agent testified that the attorney asked the agent if he would mind if the attorney sat in on the interview. The agent testified that he agreed out of "fairness," but told the attorney to "keep [his] mouth shut."

Agent Jordan testified that he attempted to continue taking the Defendant's statement, but that when he asked the Defendant how to spell "genitalia," a woman opened the door to the interview room. The agent testified that after he escorted the woman out of the room, the Defendant turned to the attorney and said, "What should I do? What should I do?" The attorney responded, "Don't say another word," and the interview was terminated. Thereafter, Agent Jordan testified that the Defendant requested to call his wife, and the agent told the Defendant that he would let the Defendant call his wife later. The Defendant did not make any phone calls while he was in the agent's presence.

At the conclusion of the State's evidence, the trial court dismissed two charges of illegally distributing Schedule IV controlled substances pursuant to the Defendant's motion pursuant to Rule

29 of the Tennessee Rules of Criminal Procedure. Thereafter, the Defendant presented his defense. The Defendant's first witness was Dr. Michael Hood, a medical doctor certified in family medicine from Newport, Tennessee, whose testimony pertained to the standard of care required of male medical doctors during the examination of a female patient. Dr. Hood stated that the presence of a nurse is "pretty much accepted as being necessary during a pelvic examination." Dr. Hood stated that about eighty percent of the time, he will not have a nurse present during breast exams in his own practice, and explained the considerations as to why a nurse is or is not present when a male doctor examines a female patient. Dr. Hood testified that when he examines a patient he often uses a rolling stool in the exam room and that, on occasion, his "private area [came] in contact with a patient's leg." Dr. Hood explained the various areas of the human body that would be necessary to listen to in order to do an examination of the heart and lungs. Dr. Hood noted that a patient's clothing could have an adverse effect on a physician's ability to hear a patient's heart and lungs during an examination. Dr. Hood testified that when examining a female patient's heart and lungs, his hands would sometimes be in contact with the patient's breasts.

Dr. Hood testified as to the location of the coccyx and that the rectum is immediately below the coccyx. Dr. Hood explained that "palpitation" means to touch a patient, "to press on a patient to try to figure, you know, the anatomical position of things." He testified that if a patient is complaining of lower back pain, it can be necessary to palpate the lower back area, including the area near the coccyx. Dr. Hood examined the medical records of certain victims and opined that the record pertaining to Kathy Ritner would indicate a need to palpate her lower back area. Dr. Hood offered a similar opinion with regard to Melissa Martin. Dr. Hood reviewed the EKG of Jamie Hunt and opined that the EKG was not consistent with an EKG that would be expected for someone who was sexually assaulted and raped while the EKG was being performed.

On cross-examination, Dr. Hood acknowledged that several of the acts alleged by the victims against the Defendant are not normally performed during the course of diagnosis and treatment for the medical needs for which victims sought medical treatment from the Defendant.

The Defendant, Stephen C. Denton, testified that he is a medical doctor and that following medical school he was on active duty in the United States Air Force. In 1981, the Defendant became employed by Athens Regional Hospital. The Defendant testified that he opened his private medical office in Athens, Tennessee, in about 1987, and practiced medicine there until 1998, when he was "thrown out." The Defendant testified that by 1998 he had over five thousand active patient files and would see sixty or more patients a day. The Defendant described his medical practice as a family practice with numerous Tenn Care and Medicare patients. The Defendant testified that he never touched any of the victims for the purpose of sexual gratification and that he never intentionally put his genitalia against any part of a patient's body. As to the victims, the Defendant testified: "I wouldn't call any of them liars. I would say that perhaps in their mind they perceived it that way, but that's not what was being done." The Defendant maintained that he had to touch Carolyn Grant's breasts to listen to her heart and that Grant was wrong if she interpreted the touching as sexual. The Defendant denied inserting his finger in Sandra Harley's vagina or in any way touching Sandra Harley for sexual gratification. The Defendant opined that Sandra Harley

"misinterpreted it or had some misconception of what was done," but stated, "I don't have an explanation."

The Defendant denied touching Brenda Mullinax for sexual gratification. He examined the medical records of Jamie Nell Hunt and testified that her EKG indicated a heart beat range of sixty-three to seventy and that extreme stress would cause an expectation of a heart rate of "well over a hundred." The Defendant examined the medical records of Kathy Ritner and explained that he would have had to palpate into the sacral or coccyx level in her case, but he did not do so for sexual gratification. The Defendant examined the medical records of Sharon Roberts and explained, "If I listened to her heart I had to touch her breasts." Again, the Defendant denied touching Sharon Roberts' breasts for sexual gratification, and he opined that Sharon Roberts was not lying but may have believed the touching was for sexual gratification but "that's not what occurred." The Defendant testified that he treated Melissa Martin for a back injury received in an automobile accident, and that he needed to feel down between her buttocks at a relatively low level. He denied touching Melissa Martin for sexual gratification or for sexual purposes.

The Defendant testified concerning his treatment of Amanda Pritchitt, explaining that he had cared for her while she was growing up and had treated her grandmother for a heart attack. He denied touching Amanda Pritchitt for purposes of sexual gratification or arousal. The Defendant explained that his examinations of the heart are sometimes extensive because of his training in cardiac surgery, thoracic surgery and cardiology, which caused the Defendant to "take much more interest in listening to [her] heart than anyone else in town might."

The Defendant testified as to his recollection of the office visit of Teresa Price. He recalled Amanda Pritchitt telling him about her friend, Teresa Price. Specifically, the Defendant testified that Pritchitt related a story that she had a friend who was distraught over a breakup of a relationship. According to the Defendant, Pritchett stated that the friend kept "coming over to their house all the time, even at night waking them up, to discuss or talk about these things." The Defendant testified that Price "really threw me for a loop" by stating that she was there to "chat." The Defendant recalled seeing the videotape of his encounter with Price. He acknowledged that he was embarrassed about his behavior, but he offered no excuse. He apologized to his wife and daughter.

The Defendant testified concerning the incidents on the day that he was arrested pursuant to the indictments in this case. The Defendant testified that Detective Matthews and Agent Jordan "busted in the office and one of them grabbed one arm and the other one grabbed the other arm, and there was some other officer behind them, and they just literally picked me up and carried me into the lab area." The Defendant testified that, during his interview with Agent Jordan and Detective Matthews at the justice center, he denied that he touched any female genitalia for sexual gratification. The Defendant testified that he had not been able to practice medicine since his arrest in August of 1998, and that it was unlikely he would ever practice medicine again. The Defendant testified that this case destroyed him, his past, his present, his future, his marriage, and his family.

-14-

On cross-examination, the Defendant admitted that he was administratively discharged from the Air Force in connection with his wrongfully prescribing drugs, as evidenced by an "acknowledgment of rights" form that he allegedly signed prior to his discharge. He stated that he told Agent Jordan in his sworn statement that he previously had some marital problems with his wife, but he denied saying that it was after the marital problems that he began having intimate contact with female patients. The Defendant denied that problems in his marriage caused him to turn to patients for sexual gratification. The Defendant denied any inappropriate contact with any patients. The Defendant admitted that he wrote a prescription for "Teresa Price" without seeing her. The Defendant also admitted that he had executed a rights waiver in June of 1996, when he was a complainant in an extortion case. The Defendant testified that he did not remember being advised of his constitutional rights in conjunction with his role in the 1996 incident.

The Defendant denied telling the law enforcement officers investigating this case that he had touched patients' private areas for sexual gratification; that he had "hunched" patients' legs before and gotten an erection; that he had exposed his penis to patients before; that he had intimate contact with patients about three years ago while having problems with his wife; that he had made advances that were unwanted, unsolicited, and non-consensual; and that he had contact with patients consisting of touching breasts and genitalia. The Defendant denied making any of the statements contained in the written sworn statement taken by Agent Jordan.

Karen Franklin testified that she lives in Sweetwater and is a nurse employed by Athens Medical Group. She testified that she was employed by the Defendant from August 1995 until March 1998, and that for most of that period of time she was the Defendant's only nurse. She testified as to the procedures for seeing patients, who numbered fifty to sixty a day. Franklin was shown the medical records of several of the patients who were victims in this case and testified that the notes that she and the Defendant made in the records were made at the time of, or immediately after, the patients' exams. She examined Jamie Hunt's EKG and opined that Hunt was relaxed when she got her EKG. Finally, Franklin testified that the Defendant was very thorough when he checked a patient and that he found a lot of heart murmurs and heart problems that were referred to a cardiology group in Knoxville. On cross-examination, Franklin recalled that Brenda Mullinax complained to her that the Defendant touched her breasts and that Mullinax would not be back to see the Defendant. Franklin reported that she told the office manager about Mullinax's complaints.

Stephanie Denton, the Defendant's daughter, testified that she lives in Athens, Tennessee, and that she is a first year student at Harvard Law School in Cambridge, Massachusetts. She stated that she was thirteen years old when her mother, Linda Denton, and the Defendant divorced. Stephanie Denton testified that during the summer after her freshman year in college, she worked with the Defendant in his office. She described the Defendant as "a very affectionate person. He's a very kind and compassionate person, and we've always hugged each other and I have observed him put his arm around people, guys, girls, women, men." Stephanie Denton also stated that the Defendant is "a very touchy person." She recalled that on the evening news on the date that her father was arrested, she saw the Athens Police Chief on television stating that if any women had ever

been treated inappropriately or ever had any complaints of any sort against her father that they should contact the authorities.

Marilyn Gay Lankford testified that she currently works as a case manager specialist for the Department of Human Services (DHS) in Cleveland, Tennessee. She testified that she was formerly a nurse and that she worked for the Defendant from December 1997 until August 1998. She stated that she was trained in office procedure by Karen Franklin. Lankford maintained that the Defendant was a good heart doctor. She testified that on the day that Teresa Price was the Defendant's patient, the Defendant was in a hurry because he had patients in the hospital that he was going to go see at lunch. On cross-examination, Lankford confirmed that Teresa Price complained of sinuses when she came into the office and that the Defendant had written "insomnia" on Price's records.

The Defendant then presented four character witnesses. The first character witness was Kenneth Wayne Wilson, who testified that he is a retired auto mechanics instructor who had worked for thirty-one years at Central High School of McMinn County. Wilson testified that he knew the Defendant's reputation in the community for truthfulness and veracity and that the Defendant's reputation is good. The next character witness, Barbara Jo Smith, testified that she lives in Madisonville, Tennessee, and that her husband is Attorney Smith. She stated that she had known the Defendant for approximately twelve years and that the Defendant had treated four generations of her family. Further, she testified that she met the Defendant's wife about four years ago and they became friends. Smith maintained that the Defendant's reputation in the community for truthfulness and veracity is very good. Harolddean Thompson, another character witness, testified that she lives in Etowah, Tennessee, and that she has known the Defendant since 1982. She reported that the Defendant's reputation in the community for truthfulness and veracity is very good. The last character witness, Melvin Ray Haney, testified that he is a retired Athens Fire Department employee and that he is a businessman, running a flower store and a furniture store. Haney stated that the Defendant's office was right across the street from his store, and that he and the Defendant often talked. Haney testified that the Defendant's general reputation in the community for truthfulness and veracity is good.

Linda Louise Denton testified that she lives in Athens, Tennessee, and is employed as a home health nurse. She testified that she is the former wife of the Defendant, that she met the Defendant in 1972, and that she married him in 1973. The marriage lasted eighteen years, and she and the Defendant are the parents of Stephanie Maria Denton. Denton testified that she had worked occasionally in her former husband's medical office. She further testified that the Defendant's general reputation in the community for truthfulness and veracity is very good. On cross-examination, Denton testified that she was aware that the Defendant voluntarily resigned from the military in lieu of court martial because he abused his prescription writing authority.

The State called as a rebuttal witness Dr. David Byrd, who testified that he is a licensed medical doctor with a family practice in Athens, Tennessee. Doctor Byrd testified that he was in the Athens Community Hospital Emergency Room on November 4, 1992, and he treated Sandra Harley. According to Dr. Byrd, Harley claimed that she had been treated at the Defendant's office and that

the Defendant had inserted several fingers into her vagina, rubbed her clitoris, and inserted tissue into her vagina. Dr. Byrd testified that he performed a pelvic exam on Harley which did not indicate the presence of vaginitis or vulvitis. Dr. Byrd also found no evidence of pubic lice. On cross-examination, Dr. Byrd admitted that he had no independent recollection of the details of the matter, and was relying on the medical record for his testimony.

### C. Evidence Presented at the Sentencing Hearing

When sentencing the Defendant, the trial court considered: the presentence report prepared by the Department of Correction, which included victim impact statements; the Defendant's sentencing memo; the Defendant's objections to the presentence report; the Defendant's military record; a report by Dr. Lyons, who examined the Defendant prior to sentencing; a report from Physicians Services, regarding a sexual harassment complaint against the Defendant in 1994; and testimony offered at the sentencing hearing. At the sentencing hearing, the only testimony offered came from Special Agent Mike Finley of the Tennessee Bureau of Investigation. Agent Finley testified regarding an incident in 1996 in which the Defendant contacted the authorities about an extortion attempt against him by one of his patients. The extortion attempt involved an audiotape of a telephone conversation between the Defendant and Angela Wilson. Allegedly the telephone conversation was of a sexual nature, and Angela Wilson's husband, Jeff Wilson, allegedly tried to extort money from the Defendant for the return of the audio tape. Through the efforts of the TBI the audiotape was recovered by the Defendant, and Agent Finley testified the Defendant then absconded with the tape. Agent Finley testified that the Defendant initially refused to give the tape to the law enforcement officers, but after twenty minutes of discussions, the Defendant agreed to give up the tape.

### II. ANALYSIS

While both parties address the severance issue first, we choose to first address the admissibility of the Defendant's statement because its admissibility is relevant to our analysis of the severance issue.

### A. Defendant's Statement to Law Enforcement

The Defendant contends that the trial court erred by denying his Motion to Suppress his statement to police. Specifically, the Defendant contends that he invoked his Fifth Amendment right to counsel when he asked the Detective if he needed an attorney. It is well-settled that a trial court's determination at a suppression hearing is presumptively correct on appeal. State v. Harbison, 704 S.W.2d 314, 318 (Tenn. 1986); see State v. Saylor, – S.W.3d –, 2003 WL 22238947, at *3 (Tenn. Sept. 30, 2003). The presumption of correctness may only be overcome on appeal if the evidence in the record preponderates against the trial court's findings. Harbison, 704 S.W.2d at 318. The prevailing party "is entitled to the strongest legitimate view of the evidence adduced at the suppression hearing as well as all reasonable and legitimate inferences that may be drawn from the

evidence." State v. Odom, 928 S.W.2d 18, 23 (Tenn. 1996); see State v. Daniel, 12 S.W.3d 420, 423 (Tenn. 2000). When reviewing a trial court's ruling on a motion to suppress, "questions of credibility of the witnesses, the weight and value of the evidence, and resolution of conflicts in the evidence are matters entrusted to the trial judge as the trier of fact." Odom, 928 S.W.2d at 23. Both the proof adduced at the suppression hearing and the proof adduced at trial may be considered in reviewing the trial court's decision on the motion to suppress. State v. Henning, 975 S.W.2d 290, 299 (Tenn.1998).

The Fifth Amendment to the United States Constitution provides, in pertinent part, that "no person . . . shall be compelled in any criminal case to be a witness against himself." U.S. Const. amend. V. Similarly, Article I, Section 9 of the Tennessee Constitution states that "in all criminal prosecutions, the accused . . . shall not be compelled to give evidence against himself." The United States Supreme Court held that, pursuant to the Fifth and Fourteenth Amendments' prohibition against compelled self-incrimination, police officers must advise a defendant of his or her right to remain silent and of his or her right to counsel before they may initiate custodial interrogation. Miranda v. Arizona, 384 U.S. 436, 479 (1966).

"[T]he right to counsel encompassed within the right against self-incrimination protected by the Fifth Amendment to the United States Constitution is triggered whenever a suspect requests that counsel be present during police-initiated custodial interrogation." State v. Huddleston, 924 S.W.2d 666, 669 (Tenn. 1996). "When a suspect invokes that right to counsel, police must cease questioning until counsel is present." Id. The United States Supreme Court held that "invocation of the Miranda right to counsel requires, at a minimum, some statement that can reasonably be construed to be an expression of a desire for the assistance of an attorney." Davis v. United States, 512 U.S. 452, 458 (1994). A suspect "'must articulate his desire to have counsel present sufficiently clearly that a reasonable [police] officer . . . would understand the statement to be a request for an attorney.'" Saylor, – S.W.3d –, 2003 WL 22238947, at *4 (quoting Huddleston, 924 S.W.2d at 670). "If the suspect fails to make such an unambiguous statement, police may continue to question him without clarifying any equivocal requests for counsel." Id.

Whether the Defendant made an unequivocal request for an attorney is a question of fact for the trial court to determine. State v. Farmer, 927 S.W.2d 582, 594 (Tenn. Crim. App. 1996). In the case under submission, the trial court denied the Defendant's Motion to Suppress noting that State v. Stephenson, 878 S.W.2d 530, 542 (Tenn. 1994), did not require "an officer to give a legal opinion to somebody, or to stop when [the defendant] says 'Do you think I need a lawyer.'" Accordingly, the trial court held:

I don't think that they were required to stop their interrogation when [the defendant said] he [did not] want a lawyer, that he just want[ed] to get it over with. And I think his statement that he didn't even want [Attorney] Smith in the room was an unequivocal rejection of an attorney at that time.

We interpret this statement by the trial court to mean that it found that the Defendant did not unequivocally request an attorney. The evidence does not preponderate against this finding.

The Defendant's inquiry, "Should I have a lawyer?" did not suffice to invoke his right to counsel under Miranda. See, e.g., Saylor, – S.W.3d –, 2003 WL 22238947, at *4 (holding that the defendant's statement "I'm supposed to have a lawyer though, don't I?" and "You have to have a lawyer present before questioning" were not unequivocal requests for an attorney when made to the non-interrogating officer and prior to the defendant being given Miranda warnings); State v. Ledford, No. E1999-00917-CCA-R3-CD, 2000 WL 1211312 (Tenn. Crim. App. Aug. 28, 2000) (holding that the defendant's assertion, "Don't I need to talk to a lawyer?" did not suffice to invoke his right to counsel under Miranda); State v. Young, No. 01C01-9605-CC-00208, 1998 WL 258466 (Tenn. Crim. App. May 22, 1998) (holding that the defendant's statement, "I'm sorry, I'm just wondering if I should have a lawyer," was not an unambiguous invocation of his right to counsel); State v. Ake, No. 01C01-9603-CC-00094, 1997 WL 311908 (Tenn. Crim. App. June 6, 1997), *perm. to appeal denied*, (Tenn. Mar. 9, 1998) (holding that the defendant's statement, "I probably need to get a lawyer, don't I?" was not an unambiguous invocation of his right to counsel); State v. North, No. 02C01-9512-CC-00369, 1996 WL 711473 (Tenn. Crim. App. Dec. 12, 1996), *perm. to appeal denied*, (Tenn. Jul. 17, 1997) (holding that the defendant's question to a detective as to whether he needed an attorney was equivocal and not a clear invocation of the right to counsel). In light of this authority, we find that the Defendant failed to make an unambiguous request for counsel after twice being informed of his right to counsel and twice waiving his right to counsel. Accordingly, he did not invoke his right to counsel, and the evidence does not preponderate against the trial court's holding that the Defendant's statement was admissible.

## B. Severance

The Defendant argues on appeal that the trial court erred by denying his Motion to Sever the charges against him. Before the trial court, the Defendant agreed that the charges involving Amanda Pritchitt and Patrice Shermerhorn should be tried together, but he contended, both prior to and several times during the trial, that the other charges should be severed for each victim and tried separately. The trial court denied the Defendant's Motion to Sever, and the Defendant now appeals.

### 1. Standard of Review

A trial court's denial of a motion to sever offenses will be reviewed for an abuse of discretion. State v. Shirley, 6 S.W.3d 243, 247 (Tenn. 1999); see State v. Moore, 6 S.W.3d 235, 238 (Tenn. 1999). This Court will not interfere with this exercise of discretion unless it appears on the face of the record that the accused was prejudiced by the trial court's ruling. State v. Wiseman, 643 S.W.2d 354, 362 (Tenn. Crim. App. 1982). Whether severance should be "granted or denied depends upon the facts and circumstances involved in the various crimes that are charged." State v. Morris, 788 S.W.2d 820, 822 (Tenn. Crim. App. 1990); see Shirley, 6 S.W.3d at 247.

### 2. Motion to Sever

Rule 14 of the Tennessee Rules of Criminal Procedure provides as follows: "If two or more offenses have been joined or consolidated for trial . . ., the defendant shall have a right to a severance of the offenses unless the offenses are part of a common scheme or plan *and* the evidence of one would be admissible upon the trial of the others." Tenn. R. Crim. P. 14(b)(1) (emphasis added). To avoid severance, both portions of the rule must be satisfied. See State v. Hallock, 875 S.W.2d 285, 289 (Tenn. Crim. App. 1993). The "primary inquiry into whether a severance should have been granted under Rule 14 is whether the evidence of one crime would be admissible in the trial of the other if the two counts of indictment had been severed," State v. Burchfield, 664 S.W.2d 284, 286 (Tenn. 1984), thereby making the question of severance "really a question of evidentiary relevance," Moore, 6 S.W.3d at 239. Further, the consolidation of offenses is proper only if the trial court concludes that:

> (1) the multiple offenses constitute parts of a common scheme or plan; (2) evidence of each offense is relevant to some material issue in the trial of all the other offenses; and (3) the probative value of the evidence of other offenses is not outweighed by the prejudicial effect that admission of the evidence would have on the defendant.

State v. Spicer, 12 S.W.3d 438, 445 (Tenn. 2000).

In deciding whether consolidation is proper in this case, we first must determine whether the prosecution offered evidence to establish that the offenses constitute parts of a common scheme or plan. State v. Toliver, – S.W.3d –, 2003 WL 2251400, at * 12 (Tenn. Oct. 2, 2003). A common scheme or plan for severance purposes is the same as a common scheme or plan for evidentiary purposes. Hallock, 875 S.W.2d at 289-90. Typically, offenses that are parts of a common scheme or plan are offered by the State to establish the identity of the perpetrator. Moore, 6 S.W.3d at 239 (citing State v. McCary, 922 S.W.2d 511, 514 (Tenn. 1996)). In Tennessee, there are three categories of common scheme or plan evidence: (1) evidence showing a distinctive design or signature crime; (2) evidence demonstrating a larger, continuing plan or conspiracy; and (3) evidence that the offenses are part of the same transaction. Id. at 240. The "'test [for finding a common scheme or plan] is not whether there was evidence that a defendant committed both crimes, but whether there was *a unique method* used in committing the crimes.'" Id. at 241 (quoting Young v. State, 566 S.W.2d 895, 898 (Tenn. Crim. App. 1978)).

Before multiple offenses are considered a distinctive design or signature crime pursuant to the first category of common scheme or plan evidence, "the 'modus operandi employed must be so unique and distinctive as to be like a signature.'" Id. at 240 (quoting State v. Carter, 714 S.W.2d 241, 245 (Tenn. 1986)). The second category, "continuing plan or conspiracy," involves not the similarity between the crimes, but rather the common goal or purpose at which they are directed. State v. Hoyt, 928 S.W.2d 935, 943 (Tenn. Crim. App. 1995). The proof sought, therefore, is of a working plan, "operating towards the future with such force as to make probable the crime for which the defendant is on trial." Id. Finally, to qualify within the "same transaction category," the crimes must occur "within a single criminal episode." Hallock, 875 S.W.2d at 290.

In our review of the record in this case, we conclude that the offenses were not committed with "such unusual particularities" as to indicate the presence of a distinct modus operandi, nor were the offenses so strikingly similar that they may be regarded as the stamp or signature of the Defendant. The methods used by the Defendant to allegedly sexually assault his female patients differed substantially among the patients. All of the patients that testified claimed that the Defendant touched them inappropriately, but their complaints varied, including complaining that the Defendant fondled their breasts, massaged their genitalia, inserted a finger into their vagina or rectum, tried to kiss them or touched their leg with an erection. These cannot be said to be "signature" crimes. Further, we find that these crimes were not committed as part of a larger, continuing plan or conspiracy, nor were they part of the same criminal transaction. Therefore, we find that the offenses were not part of a common scheme or plan and that the trial court erred when it denied the Defendant's Motion to Sever.

### 3. Harmless error

Having determined that the trial court abused its discretion in consolidating the indictments over the Defendant's objection, we must next consider whether the error more probably than not affected the judgment. See Tenn. R. Crim. P. 52 (a); Tenn. R. App. P. 36 (b); Toliver, – S.W.3d –, 2003 WL 22251400, at *14; Spicer 12 S.W.3d at 447. Tennessee Rule of Criminal Procedure 52 states that no conviction is to be reversed on appeal "except for errors which affirmatively appear to have affected the result of the trial on its merits." See also Tenn. R. App. P. 36(b). Because the question of whether to grant a severance under Tennessee Rule of Criminal Procedure 14(b)(1) is primarily an evidentiary question, the effect of a denial of that right is weighed by the same standard as other non-constitutional evidentiary errors: the defendant must show that the error probably affected the judgment before reversal is appropriate. Moore, 6 S.W.3d at 242. We hold that the Defendant in the case under submission has failed to meet this burden, and, therefore, the denial of severance was harmless error.

The Defendant contends that the joinder of offenses was confusing and prejudiced the Defendant. While it is true that under some circumstances there is a danger that a jury may use the evidence of other similar acts to conclude that a defendant has a propensity to commit certain types of crimes, the rationale for Tennessee Rule of Evidence 404(b), it is equally true that the "line between harmless and prejudicial error is in direct proportion to the degree of the margin by which the proof exceeds the standard required to convict, beyond a reasonable doubt." Toliver, – S.W.3d –, 2003 WL 22251400, at *14; Delk v. State, 590 S.W.2d 435, 442 (Tenn. 1979).

The weight of the evidence against the Defendant in the case before us far exceeded the standard required to convict him beyond a reasonable doubt and is, in fact, overwhelming. The evidence presented to the jury included: testimony from the victims that the Defendant inappropriately touched them; the Defendant's statements to police that "some of [my] advances were unwanted, unsolicited, and not consensual," and that, "The contact I have had with patients consist of touching breasts and genitalia;" and the Defendant's testimony at trial that while he had, in fact, touched the victims, the victims mistakenly interpreted that touching as being for sexual

gratification and not for medical purposes. As previously stated, this evidence far exceeded that necessary for conviction. Further, we are persuaded that the jury did not consider all the offenses as propensity evidence because the jury acquitted the Defendant of six counts. We conclude that, in light of the overwhelming evidence against the Defendant and because the jury acquitted the Defendant of some of the charges against him, the error did not "more probably than not" affect the judgment and was, therefore, harmless. Accordingly, we find that reversal is not appropriate on the basis of this harmless error by the trial court.


## C. Improper Cross-Examination

The Defendant contends that the trial court erred by allowing the prosecution to improperly cross-examine the Defendant and his former wife. Specifically, he argues that the State should not have been allowed to cross-examine him about: (1) the fact that he received an administrative discharge from the Air Force; (2) the fact that he had written an improper prescription; and (3) about his familiarity with Miranda warnings.

"A witness may be cross-examined on any matter relevant to any issue in the case, including credibility . . . ." Tenn. R. Evid. 611(b). The witness's credibility may be questioned by an adverse party through impeachment of the witness by rebutting a factual assertion made by the witness to be impeached. Neil P. Cohen et al., Tennessee Law of Evidence §§ 6.11[5][a], 607[4][a] (4th ed. 2000 & Supp. 2002). If the trier of fact believes the contradictory evidence presented by the impeaching party, the witness's credibility is surely diminished. Id. at § 6.07[4][a].

The propriety, scope, manner, and control of cross-examination rests within the sound discretion of the trial court. See State v. Hutchinson, 898 S.W.2d 161, 172 (Tenn. 1994); State v. Barnard, 899 S.W.2d 617, 624 (Tenn. Crim. App. 1994). Absent a clear abuse of this discretion that results in manifest prejudice to the accused, this Court will not interfere with the trial court's exercise of its discretion on matters pertaining to the examination of witnesses. State v. Johnson, 670 S.W.2d 634, 636 (Tenn. Crim. App. 1984).

On direct examination the Defendant testified that he was on active duty in the Air Force from 1968 to 1981 and achieved a rank of Lieutenant Colonel. Further, he testified that he practiced medicine while on active duty and that whenever he got permission, he would go on "dustoff" missions to pick up casualties. In addition, the Defendant participated in "Medivac missions picking up emergencies around the world." The Defendant also testified that he was "Chief of Air Space Medical Departments for several airbases, and had to work in emergency departments at the hospital." On cross-examination, the Defendant testified that he was discharged from the military after he made a "mistake" by having a "friend" improperly fill a prescription that he intended to take himself.

Clearly, the trial court did not abuse its discretion by allowing evidence regarding the nature of the Defendant's discharge from the military. The Defendant opened the door to inquiry into his

discharge by testifying about his thirteen-year military service and the nature of that service, implying to the jury a long term of honorable service to his country. See Johnson, 670 S.W.2d at 636. The fact that his discharge came after the military became aware that he improperly wrote a prescription contradicts the assertion that he served his country honorably for the duration of his military career.

The Defendant also contends that the trial court abused its discretion when it allowed the State to question the Defendant regarding an "acknowledgment of rights" form, similar to a Miranda waiver form, that he signed when he was discharged from the military. Similarly, he contends that the State improperly questioned him about a waiver of rights form that he signed when he was the complainant in a criminal case. We find that the trial court did not abuse its discretion when it permitted cross-examination on these subjects.

When asked about the circumstances of his arrest, the Defendant testified that the officers "just handed [the waiver to him and] said . . . 'you have to sign right here.'" Further, he testified that he "didn't have the foggiest idea what [he] was signing . . . ." The State asked the Defendant to recall his testimony from the pre-trial hearing where he admitted to signing a rights waiver, but denied understanding it and stated, "I was in a state of shock. This thing took me totally by surprise. I didn't have a clue what I was signing. I was just told to sign it, that I had better sign it." Thereafter, the State asked the Defendant if he recalled that when the State asked him if he was familiar with his right to have an attorney from his own life's experience at the pre-trial hearing he testified, "I don't know much about it. I have never been arrested before." The Defendant responded, "That sounds like what I said."

We find some merit in the Defendant's argument that allowing testimony of prior arrests, or encounters with police in which Miranda warnings were given, could circumvent the prohibition against "prior bad act" testimony. However, by testifying that he had "never been arrested before" so he "didn't know much about" a waiver of rights form, the Defendant opened the door to cross-examination about whether he was familiar with a waiver of rights form. Accordingly, the State presented two similar forms that had been signed by the Defendant and inquired as to each. The trial court strictly limited the scope of the State's cross. The court did not allow the State to admit the military's "acknowledgement of rights" form into evidence and also limited the State's inquiry to whether "there was a time when he was a complain[ant] against somebody else" and "if at some point [an officer] gave him [a waiver of rights form]." The State was not permitted to inquire as to the facts of the case or to imply that the Defendant had "done anything wrong." We find that the trial court did not abuse its discretion by permitting this limited inquiry of these two documents.

Having so determined, we now address the Defendant's contention that the State should not have been allowed to cross-examine his former wife about his discharge from the Air Force. The Defendant's wife testified on direct examination that "Doctor Denton was honorably discharged in 1981." As previously stated, the credibility of any witness may be attacked, and it may be attacked by questioning the witness about contradictory facts. The Defendant's former wife's testimony about

his "honorable discharge" opened the door to inquiry about the circumstances surrounding the discharge. Accordingly, the trial court properly permitted this cross-examination.

### D. "Supervisory Power" of the Defendant

Next, the Defendant contends that the evidence presented at trial was insufficient to support his conviction for sexual battery by an authority figure because he did not exercise "supervisory power"over victim Amanda Pritchett, who was seventeen at the time of the assault. Sexual battery by an authority figure is defined by Tennessee Code Annotated section 39-13-527 (1998), which states:

> (a) Sexual battery by an authority figure is unlawful sexual contact with a victim by the defendant or the defendant by a victim accompanied by the following circumstances:
>
> (1) The victim was, at the time of the offense, thirteen (13) years of age or older but less than eighteen (18) years of age; and either
>
> (A) The defendant had, at the time of the offense, supervisory or disciplinary power over the victim by virtue of the defendant's legal, professional or occupational status and used such power to accomplish the sexual contact; or
>
> (B) The defendant had, at the time of the offense, parental or custodial authority over the victim and used such authority to accomplish the sexual contact.

The issue we must decide is whether a doctor exercises "supervisory power" over a patient who is between thirteen and eighteen years of age. This question is one of statutory interpretation and, as such, we review it de novo, without a presumption of correctness. State v. Walls, 62 S.W.3d 119, 121 (Tenn. 2001). When construing any statute, our paramount obligation is to ascertain and effectuate the Legislature's intent. State v. Alford, 970 S.W.2d 944, 946 (Tenn. 1998). In order to do so, we take the natural and ordinary meaning of the language contained in the statute, without a forced construction to limit or extend its meaning. State v. Whitehead, 43 S.W.3d 921, 928 (Tenn. Crim. App. 2000). All ambiguities will be resolved in favor of the defendant. State v. Rogers, 992 S.W.2d 393, 400 (Tenn. 1999).

Black's Law Dictionary defines "supervise" as "to have general oversight over, to superintend or to inspect." Black's Law Dictionary 1438 (6th ed. 1990). "Supervisory power" is the power to control or direct that which is being controlled or directed. See generally State v. Torres, 82 S.W.3d 236, 254 (Tenn. 2002) (discussing the "supervisory power" of the Tennessee Supreme Court over the trial courts). For the purposes of Tennessee Code Annotated section 39-13-527, we conclude that a doctor possesses supervisory power over a patient between the ages of thirteen and eighteen when the doctor is conducting a physical examination of the patient.

The Defendant states that the purpose of the statute, as articulated during the Judiciary Committee discussions, is to "stop a 'sex offender in authority from using that authority to manipulate a child into sexual contact.'" The Defendant then contends that this "comfortably describes the relationships between teacher and student, counselor and camper, jailer and prisoner," but does not describe a doctor's relationship with a patient. We, respectfully, disagree.

We have previously noted that, in the doctor physician relationship, "[t]here is an inherent trust and confidence which a patient seeking medical care places in the physician and upon which a patient relies in allowing the physician access to the most intimate parts of the body." State v. Tizard, 897 S.W.2d 732, 742-43 (Tenn. Crim. App. 1994) (discussing the patient/doctor relationship in the context of sexual battery committed by fraud). A doctor, who is in a position of great trust, directs the patient throughout the entire examination, telling the patient whether she should remove any or all of her clothing in order to be properly examined, touching parts of her body that the doctor deems necessary to be touched, and advising the patient to act in a manner so as to facilitate the doctor's ability to diagnose the patient. The patient, in most cases, follows the direction of the doctor to be properly diagnosed and treated for the medical condition that brought the patient to the doctor. This is "supervisory power" as defined and contemplated by the statute. When a doctor abuses this "supervisory power" to inappropriately touch a minor patient, he has committed sexual battery.

In the case under submission, the Defendant was purporting to examine the seventeen-year-old victim, Amanda Pritchett, for ringworm. The Defendant asked the victim to pull her pants down so he could see her ringworm, and she responded that she did not need to do so because the ringworm was right under her belly button. The Defendant then put his fingers between her "vagina lips" and "rubbed" her there despite the victim's assertion that there was no ringworm down there. This evidence is clearly sufficient to show that the Defendant committed sexual battery by an authority figure.

### E. State's Rebuttal Summation

The Defendant contends that the prosecution's rebuttal summation was "highly inflammatory and highly prejudicial." The Defendant states that the State improperly personalized the charges and invited the jurors to think about the Defendant's subjecting their own daughters to the conduct with which he was charged by stating:

> If you don't want to have your daughters' clitoris massaged during a pelvic exam you might want to think about convicting him . . . . If you don't want your daughter to be sitting in his office with your doctor's penis pressed against her in an erect fashion you might want to think about convicting him . . . . If you don't want . . . your daughter getting a fake EKG and her nipples fondled you might want to think about convicting him.

"In determining whether statements made in closing argument constitute reversible error, it is necessary to determine whether the statements were improper and, if so, whether their impropriety affected the verdict." State v. Sutton, 562 S.W.2d 820, 823 (Tenn. 1978). "The trial court has wide discretion in controlling the course of arguments and will not be reversed absent an abuse of that discretion." State v. Bane, 57 S.W.3d 411, 425 (Tenn. 2001). In addition, "prosecutorial misconduct does not amount to reversible error absent a showing that it has affected the outcome to the prejudice of the defendant." Id. Arguments must be temperate, predicated on evidence introduced during the trial, relevant to the issues being tried, and not otherwise improper under the facts or law. State v. Middlebrooks, 995 S.W.2d 550, 557 (Tenn. 1999). Because closing arguments are an important part of the trial process, attorneys are usually given wide latitude in the scope of their arguments. State v. Nesbit, 978 S.W.2d 872, 900 (Tenn. 1998).

To preserve the issue of prosecutorial misconduct for appeal, the defendant must object and call the issue to the trial court's attention; any failure to do so constitutes a waiver of the issue. Tenn. R. App. P. 36(a); State v. Hall, 8 S.W.3d 593, 596 n.1 (Tenn. 1999). Additionally, issues upon which a new trial is sought that are not included in the defendant's motion for new trial are waived. Tenn. R. App. P. 3(e); Tenn. R. App. P. 36(a). We review issues that are waived by the defendant only for "plain error." Tenn. R. Crim. P. 52(b).

In the present case, the Defendant failed to object to the prosecutor's summation at trial, did not ask for a curative instruction and did not raise this issue in any of his motions for new trial. Tenn. R. App. P. 36(a). Accordingly, we find that he has waived this issue. Furthermore, in our view, the prosecutor's summation does not rise to the level of plain error.

## F. Consent of Undercover T.B.I. Agent "Victim"

The Defendant contends that the trial court erred by denying his request for a jury instruction on consent as a defense to the offense involving victim Patrice Schermerhorn. The Defendant was charged with sexual battery against Schermerhorn, and the jury convicted the Defendant of the lesser-included offense of assault.

Sexual battery is unlawful sexual contact with a victim by the defendant or the defendant by a victim accompanied by any of the following circumstances:

(1) Force or coercion is used to accomplish the act;

(2) The sexual contact is accomplished without the consent of the victim and the defendant knows or has reason to know at the time of the contact that the victim did not consent;

(3) The defendant knows or has reason to know that the victim is mentally defective, mentally incapacitated or physically helpless; or

(4) The sexual contact is accomplished by fraud.

Tenn. Code Ann. § 39-13-505(a) (1997). The State elected to proceed only on the theory of sexual battery by fraud, and only that theory was charged to the jury. The Defendant requested that the trial court instruct the jury on consent, a request which the trial court denied.

The general principle in criminal cases is that there is a duty upon the trial court to "give a complete charge of the law applicable to the facts of the case and the defendant has a right to have every issue of fact raised by the evidence and material to his defense submitted to the jury upon proper instructions by the judge." State v. Sims, 45 S.W.3d 1, 9 (Tenn. 2001) (citing State v. Thompson, 519 S.W.2d 789, 792 (Tenn. 1975)). In determining whether a defense instruction is raised by the evidence, the court must examine the evidence in the light most favorable to the defendant to determine whether there is evidence that reasonable minds could accept as to that defense. State v. Bult, 989 S.W.2d 730, 733 (Tenn. Crim. App. 1998); see also Johnson v. State, 531 S.W.2d 558, 559 (Tenn. 1975). When the entire charge, read as a whole, fully and fairly sets out the applicable law, the trial judge does not err in denying a special instruction requested by a party or in denying an inaccurate or inapplicable instruction to the case at hand. State v. Bohanan, 745 S.W.2d 892, 897 (Tenn. Crim. App. 1987).

In the context of a doctor-patient relationship where sexual contact is accomplished by fraud, consent is not a defense. State v. Tizard, 897 S.W.2d 732, 742 (Tenn. Crim. App. 1994) (citing Tenn. Code Ann. § 39-11-106 (a)(9)(A)[1] (1997)). The explanation for this being that the patient consents to the touching in reliance upon the "inherent trust and confidence which a patient seeking medical care places in the physician and upon which a patient relies in allowing the physician access to the most intimate parts of the body." Id. at 742-43. Therefore, the patient's consent, since it is induced by the physician's fraudulent representation that the doctor's touching is for medical purposes, is not a defense to the doctor's sexual assault. Accordingly, the trial court correctly denied the Defendant's request for an instruction on consent as to the sexual battery charge.

This issue, however, is made more complicated because the trial court also properly instructed the jury on assault as a lesser-included offense of sexual battery, and the jury found the Defendant guilty of assault and not sexual battery. Consent is a defense to assault. See State v. McKnight, 900 S.W.2d 36, 49 (Tenn. Crim. App. 1994) (stating "[T]e consent of the victim is no defense to statutory rape. The same does not hold true for assault.").

---

[1]That statute reads:

"Effective consent" means assent in fact, whether express or apparent, including assent by one legally authorized to act for another. Consent is not effective when: (A) Induced by deception or coercion; (B) Given by a person the defendant knows is not authorized to act as an agent; (C) Given by a person who, by reason of youth, mental disease or defect, or intoxication, is known by the defendant to be unable to make reasonable decisions regarding the subject matter; or (D) Given solely to detect the commission of an offense . . . .

When discussing the proposed jury instructions with the two parties in the case under submission, the trial court stated that it intended to charge the jury with the following instruction:

> Doctor Denton denies he had sexual contact with Tennessee Bureau of Investigation Special Agent Patrice Schermerhorn as defined above and charged in Case Number 98-538. Dr. Denton alternatively asserts that any claimed sexual contact by Doctor Denton with Agent Schermerhorn was with her consent. A willing act of sexual intimacy between persons of sufficient age is not criminal sexual contact.

While the trial judge told the parties that he intended to so charge the jury, he omitted this instruction from the jury charge. When the Defendant objected to the trial court's omission of this instruction, the trial court noted that the Defendant claimed that he did not have sexual contact with the agent and that, therefore, he would not charge the jury "alternatively" with a consent instruction. Accordingly, the trial court overruled the Defendant's objection. It is from that ruling that the Defendant appeals.

We find that, considering the evidence presented at trial in the light most favorable to the Defendant, reasonable minds could accept the defense of consent when considering the lesser-included offense of assault. While the trial court aptly noted that the Defendant presented "alternate" theories of defense, we note that this does not necessarily preclude an instruction on both theories. The Tennessee Supreme Court has held trial counsel ineffective when counsel failed to develop alternative theories of defense. See State v. Honeycutt, 54 S.W.3d 762, 768 (Tenn. 2001). It would follow that when effective counsel develops alternative theories of defense, the trial court should instruct the jury upon these theories, assuming that the aforementioned requirements are met. Therefore, we must look to see if the requirements of the requested consent instruction are present in this case.

A requested instruction should be given if: (1) it is supported by the evidence; (2) it embodies the party's theory; and (3) it is a correct statement of the law. State v. James, No. 01C01-9803-CC-00093, 1999 WL 618886, at *9 (Tenn. Crim. App. Aug. 11, 1999), *perm. to appeal denied*, (Tenn. Feb. 14, 2000) (citing Mitchell v. Smith, 779 S.W.2d 384, 390 (Tenn. 1989)). The evidence supported a consent instruction. While the agent did show signs of pushing the Defendant away, she also held his hand, allowed him to rub her leg, inquired as to whether the Defendant was going to go out with her and her friend and introduced herself as a "party girl." Under these circumstances, a reasonable mind could accept that the agent consented to the Defendant's touching. The Defendant's theory was two-fold. First, he argued that there was no sexual touching. Second, he argued that if the touching was sexual, it was consensual. Finally, the proposed instruction was a correct statement of the law in that consent, as defined in the proposed instruction, is a defense to assault. Therefore, the trial court erred by not instructing the jury on the defense of consent and this error was not harmless beyond a reasonable doubt. Accordingly, we reverse the Defendant's

conviction for assault of Schemerhorn, as a lesser-included offense of sexual battery in case number 98-538, and remand[2] the case for a new trial.[3]

## G. Election

The Defendant argues that the trial court erred by failing to require the State to elect among the various allegations of sexual battery committed against Sharon Roberts. The Defendant points out that Roberts testified that she saw the Defendant multiple times between March and April of 1998, and that each time she saw the Defendant he had his hand on her breast. The State contends that, while Roberts did offer some testimony as to other encounters with the Defendant, Roberts testified primarily to a single event. We agree with the State.

The issue we must decide is whether the trial court erred by failing to require the State to elect a set of facts, or a particular visit, upon which the State was relying to support the sexual battery charge. The Tennessee Supreme Court has "consistently held that when the evidence indicates that the defendant has committed multiple offenses against a victim, the prosecution must elect the particular offense as charged in the indictment for which the conviction is sought." State v. Brown, 992 S.W.2d 389, 391 (Tenn. 1999) ("Brown I") (citing Tidwell v. State, 922 S.W.2d 497 (Tenn. 1996); State v. Shelton, 851 S.W.2d 134 (Tenn. 1993); State v. Brown, 762 S.W.2d 135 (Tenn. 1988); Burlison v. State, 501 S.W.2d 801 (Tenn. 1973)); see State v. Kendrick, 38 S.W.3d 566, 567 (Tenn. 2001). In Brown I, the Supreme Court stated that the requirement of election serves numerous interests: "It enables the defendant to prepare for the specific charge; it protects a defendant against double jeopardy; it enables the trial judge to review the weight of the evidence in its role as thirteenth juror; and it enables an appellate court to review the legal sufficiency of the evidence." Brown, 992 S.W.2d at 391. Further, the Court stated that "[t]he most important interest served by election, however, is to ensure that the jurors deliberate over and render a verdict based on the same offense." Id.

"The necessity of requiring the State to make an election of the particular offense it will rely on for conviction . . . is . . . fundamental, immediately touching the constitutional rights of an accused, and should not depend upon his demand therefor." Burlison, 501 S.W.2d at 804. Although the federal constitution's requirement of unanimity among jurors has not been imposed on the states through the Fourteenth Amendment, "there should be no question that the unanimity of twelve jurors is required in criminal cases under our state constitution." State v. Brown, 823 S.W.2d 576, 583 (Tenn. Crim. App. 1991). More recently, the Tennessee Supreme Court has enumerated on that

---

[2] The Defendant contends that this case should not be remanded, but should be dismissed because the evidence is insufficient for assault. We, however, find that the evidence presented at trial, and articulated above, is sufficient for an assault conviction. Accordingly, we remand the case for a new trial consistent with this opinion.

[3] Our reversal does not affect the Defendant's sentence because the Defendant was sentenced to 11 months and 29 days for this assault conviction and his sentence was to run concurrently with the other sentences imposed upon him by the trial court.

requirement by stating: "A defendant's right to a unanimous jury before conviction requires the trial court to take precautions to ensure that the jury deliberates over the particular charged offense, instead of creating a "patchwork verdict" based on different offenses in evidence." Kendrick, 38 S.W.3d at 568 (citing Shelton, 851 S.W.2d at 137). In cases such as this one, the State "must either limit the testimony of prosecuting witnesses to a single event, or prepare the case so that an election can be made before the matter is submitted to the jury to decide." Id.

We find that an election of offenses was not required because the Defendant's conduct against Roberts constituted a single offense. Roberts testified about a time when she went to see the Defendant complaining of back pain. She testified that, while examining her, the Defendant checked her heart and his "hand when inside my shirt and down to my [breasts] with his stethoscope and then his hand was going down in my britches." She told the Defendant "that's not where my back hurts" and asked him to move his hand. The Defendant's hand was inside the back of her pants, almost down to her buttocks. Roberts then testified that the Defendant treated her the same way each time she saw him. Roberts' statement that the Defendant treated her the same each time she saw him, while gratuitous, did not constitute testimony regarding a separate offense. The proof in this case established that the Defendant committed sexual battery against Roberts on the one occasion when she went to see him complaining of back pain. Accordingly, the judgment of the trial court to not require the State to elect a set of facts to support the charge of sexual battery against Roberts was not error. This issue is, therefore, without merit.

## H. Sentencing

The Defendant argues that the trial court erred in sentencing him. The jury convicted the Defendant of six counts of sexual battery, one count of sexual battery by an authority figure, and three counts of assault[4] and acquitted the Defendant on the remaining six counts. Following a sentencing hearing, the trial court imposed an effective sentence of five years of incarceration. When a criminal defendant challenges the length, range, or manner of service of a sentence, the reviewing court must conduct a de novo review of the sentence with a presumption that the determinations made by the trial court are correct. Tenn. Code Ann. § 40-35-401(d) (1997). This presumption, however, "is conditioned upon the affirmative showing in the record that the trial court considered the sentencing principles and all relevant facts and circumstances." State v. Ashby, 823 S.W.2d 166, 169 (Tenn. 1991). In the event that the record fails to show such consideration, the review of the sentence is purely de novo. State v. Shelton, 854 S.W.2d 116, 123 (Tenn. Crim. App. 1992).

In making its sentencing determination at the conclusion of the sentencing hearing, the trial court determines the range of sentence and then determines the specific sentence and the propriety of sentencing alternatives by considering:

---

[4]We previously reversed one count of assault because the jury was not instructed on the defense of consent.

(1) The evidence, if any, received at the trial and the sentencing hearing; (2) The presentence report; (3) The principles of sentencing and arguments as to sentencing alternatives; (4) The nature and characteristics of the criminal conduct involved; (5) Evidence and information offered by the parties on the enhancement and mitigating factors . . . ; and (6) Any statement the defendant wishes to make in the defendant's own behalf about sentencing.

Tenn. Code Ann. § 40-35-210(b) (1997); State v. Williams, 920 S.W.2d 247, 258 (Tenn. Crim. App. 1995).

The presumptive sentence to be imposed by the trial court for a Class B, C, D or E felony is the minimum sentence within the applicable range unless there are enhancement or mitigating factors present. Tenn. Code Ann. § 40-35-210(c) (1997). If there are enhancement or mitigating factors, the court must start at the presumptive sentence, enhance the sentence as appropriate for the enhancement factors, and then reduce the sentence as appropriate for the mitigating factors. Tenn. Code Ann. § 40-35-210(e). The weight given to each factor is left to the discretion of the trial judge. Shelton, 854 S.W.2d at 123. However, the sentence must be adequately supported by the record and comply with the purposes and principles of the 1989 Sentencing Reform Act. State v. Moss, 727 S.W.2d 229, 237 (Tenn. 1986).

When imposing a sentence, the trial court must make specific findings of fact on the record supporting the sentence. Tenn. Code Ann. § 40-35-209(c). The record shall also include any enhancement or mitigating factors applied by the trial court. Tenn. Code Ann. § 40-35-210(f). Thus, if the trial court wishes to enhance a sentence, the court must state its reasons on the record. The purpose of recording the court's reasoning is to guarantee the preparation of a proper record for appellate review. State v. Ervin, 939 S.W.2d 581, 584 (Tenn. Crim. App. 1996). Because the record in this case indicates that the trial court adequately considered the enhancement and mitigating factors, as well as the underlying facts, our review is de novo with a presumption of correctness.

Enhancement factors must be "appropriate for the offense" and "not themselves essential elements of the offense." Tenn. Code Ann. § 40-35-114 (1997).

The obvious purpose of these limitations is to exclude enhancement factors which are not relevant to the offense and those based on facts which are used to prove the offense. Facts which establish the elements of the offense charged may not also be the basis of an enhancement factor increasing punishment. The legislature, in determining the ranges of punishment within the classifications of offenses, necessarily took into account the culpability inherent in each offense.

State v. Jones, 883 S.W.2d 597, 601 (Tenn. 1994).

If our review determines that the trial court followed the statutory sentencing procedure, that the court imposed a lawful sentence after giving due consideration and proper weight to the factors

and principles set out under the sentencing law, and that the trial court's findings of fact are adequately supported by the record, then we may not modify the sentence "even if we would have preferred a different result." State v. Fletcher, 805 S.W.2d 785, 789 (Tenn. Crim. App. 1991). The defendant bears the burden of showing the impropriety of the sentence imposed. Ashby, 823 S.W.2d at 169.

At the sentencing hearing, the trial court considered the Department of Correction presentence report, the Defendant's objections to the presentence report, the Defendant's sentencing memorandum, records pertaining to the Defendant's military service, a sex offender evaluation report, and a report from the Defendant's former employer.

### 1. Length of Sentence

The Defendant contends that the trial court erred by failing to apply any mitigating factors when determining the length of his sentence and that his sentence of five years of incarceration is too lengthy. The Defendant requested that the court consider five mitigating factors, three of which he maintains are error on appeal: (1) the Defendant's conduct did not cause or threaten serious bodily harm, see Tenn. Code Ann. § 40-35-113(1); (2) the Defendant's excellent employment history, see Tenn. Code Ann. § 40-35-113(13); and (3) the Defendant's lack of criminal history, see Tenn. Code Ann. § 40-35-113(13). The trial court denied the mitigating factors and applied one enhancement factor: that the defendant "abused a position of public or private trust, or used a special skill in a manner that significantly facilitated the commission or the fulfillment of the offense." Tenn. Code Ann. § 40-35-114(15). The Defendant appeals.

In rejecting the first mitigating factor the court stated that in light of the victim impact statements, "it appeared to me that there were injuries that may not have caused blood, but . . . caused great suffering. To these women their injuries were very significant." The victim impact statements included the following statements by the victims: "my dreams were haunted by another face, another voice, that of the Defendant;" "I have lost trust in the medical profession and was made to feel unhuman at times because of the way I was violated;" "my life has been changed in a way that I will never understand;" and "I am still scared to go see a doctor. I'm scared when a door is shut and I'm alone in a room with a male who is not my spouse. My hands shake and get sweaty. I can't think. All I want to do is get up and run." In accordance with this evidence, we find that the trial court did not abuse its discretion by refusing to apply the first mitigating factor.

The trial court also refused to mitigate the Defendant's sentence based upon his employment history. In so doing, the trial court stated that the mitigating factor was "overcome by the Defendant's discharge from Bradley Memorial ER for sexual harassment," where the evidence showed that the harassment complaint "was one of several lodged against [the Defendant] in the past few years." In addition, the trial court noted that the Defendant resigned from the military in lieu of a court martial because he illegally prescribed drugs and his current convictions were for offenses that occurred during the course of his employment. We find that, in light of these considerations,

the evidence does not preponderate against the trial court's refusal to mitigate the Defendant's sentence based upon his employment history.

The last mitigating factor that the Defendant appeals is the trial court's refusal to mitigate the Defendant's sentence based upon his lack of criminal history. However, the record clearly indicates that the Defendant resigned from the military in lieu of a court martial for "illegally obtaining and transferring a controlled drug, specifically Valium." This qualifies as criminal history and the trial court did not err in refusing to apply this mitigating factor. As further support for this holding, we note that this Court held, in State v. Williams, 920 S.W.2d 247 (Tenn. Crim. App. 1995), that the trial court is not required to consider lack of criminal history as a mitigating factor. Accordingly, we affirm the trial court's imposition of five years of incarceration.

### 2. Consecutive Sentences

The Defendant also contends that the trial court erred by ordering that his sentences run consecutively. It is within the sound discretion of the trial court whether an offender should be sentenced consecutively or concurrently. State v. James, 688 S.W.2d 463, 465 (Tenn. Crim. App. 1984). A court may order multiple sentences to run consecutively if it finds by a preponderance of the evidence that "[t]he defendant is an offender whose record of criminal activity is extensive." Tenn. Code Ann. § 40-35-115(b)(2) (1997). In addition to this criterion, consecutive sentencing is subject to the general sentencing principles providing that the length of a sentence should be "justly deserved in relation to the seriousness of the offense," Tenn. Code Ann. § 40-35-102(1), and "no greater than that deserved for the offense committed," Tenn. Code Ann. § 40-35-103(2). See also State v. Imfeld, 70 S.W.3d 698, 708 (Tenn. 2002).

When the trial court imposed consecutive sentences, it noted:

The court finds the defendant's record of criminal activity is extensive. It is apparent that his activities of a criminal nature were officially discovered and presented while the defendant was in the U.S. Air Force. They have continued as evidenced in this case for a number of years during his medical practice in McMinn County.

Despite the fact that the Defendant in the case under submission did not have any prior criminal convictions on his record, his criminal behavior, because of the multiplicity of the counts and the duration of time over which they occurred, makes him "an offender whose record of criminal activity is extensive." See State v. Cummings, 868 S.W.2d 661, 667 (Tenn. Crim. App. 1992); State v. Bennett, No. M2002-01215-CCA-R3-CD, 2003 WL 1562090, at *2 (Tenn. Crim. App. Mar. 26, 2003). Accordingly, we find that the evidence did not preponderate against the trial court's finding that the Defendant was an offender with extensive criminal history. Therefore, we affirm the trial court order that the Defendant's sentences run consecutively.

### III. CONCLUSION

In accordance with the foregoing, we affirm all of the Defendant's convictions and sentences save one, the conviction of assault against Patrice Schermerhorn, in case number 98-538, which we reverse and remand.

_____
ROBERT W. WEDEMEYER, JUDGE